And our last case on the calendar, United States v. Nixon, 18-1154. Okay. May it please the court, counsel. My name is Scott Reich, and it's my pleasure to be here on behalf of Mr. Nixon today. And we're here because we're asking the court to review the decision from the district court as to whether Mr. Nixon's Sixth Amendment right to a speedy trial was violated, and it's our position that it was. Obviously, the Tenth Circuit has laid out certain guidelines, and we believe that the court, following not only the Barker test, as well as the guidance given in Spletzer, that the court's decision was an error. In this particular case, Mr. Nixon was in custody in the Denver Detention Center, a location of the U.S. district court just across the street. And in that particular case, the United States government decided to charge Mr. Nixon with a violation of a previous defender statute. And that indictment came down on June 7th, 2016. It wasn't until May 8th of 2017 that the government took any action whatsoever to have Mr. Nixon brought before a magistrate for his initial advisement. And that was when the court, or that was when the U.S. attorney on May 8th filed a writ, and the court then issued a writ to have Mr. Nixon brought over on May 10th of 2017. It wasn't until June 15th that Mr. Nixon made an initial appearance. And at that initial appearance, it was still, Mr. Nixon was still without counsel. In the record, I was there because I was contacted by the Office of the Public Defender who was doing the intakes. They contacted me, as well as simultaneous, we were there to see Mr. Nixon at the Denver Detention Center, and they had told us that he had been picked up that morning on a writ to the U.S. district court. So we came over, we were there at the initial advisement, there was a colloquy between myself and Magistrate Tafoya, whereby we say, we've been contacted, if the public defenders have a conflict or if there's a reason, we just want to make sure Mr. Nixon gets counsel. And ultimately, we were appointed to represent Mr. Nixon on that matter. But he did not have counsel until that date, actually a couple days thereafter when the appointment was done, and he appeared on the 22nd of June 2017 for an arraignment detention hearing and matters of that nature. Once he had counsel, obviously we entered pleas of not guilty, the matter was set before the court, and trial dates were set in accordance with the Speedy Trial Act. And obviously the Sixth Amendment, in all criminal cases, guarantees that one has a right to a speedy and public trial. And the burden is on the prosecution to bring the defendant to the court. Even the court has some responsibility to that. Judge Daniel made a comment that his first contact or first knowledge that this case was really pending was when the writ was filed. So I think the court acknowledged that something was there and something had, for lack of a better term, gone wrong. And so, in the Barker case, Barker v. Wingo, the Supreme Court tells the courts to look at the length of the delay here from the time of indictment to the time that he's brought and ultimately the trial date, which was set, was a year and four months. Which gets us over the hurdle of whether he should have been brought in the first place. Can I ask you just a detailed question, and I don't know that it particularly matters, but it is a legal question. As far as the end date for determining the duration of the delay, wouldn't we, do we look at the date that the motion to dismiss, based on the Sixth Amendment violation, was denied? You said the trial date. Well, the trial date was after the denial of the motion to dismiss. Don't we look at the denial of the motion to dismiss as the end date? Or do we? Well, I really don't know. Your Honor, there's case law, and normally in cases, that is the issue because one precedes the trial. In this particular case, I think it's a little unique because it was a conditional plea, and this issue was to be brought up on appeal. There's case law out there that it seems to indicate that it's really from the date that the trial is set, the 70 days from the date of the arraignment, and that's where the year and four months comes. But even if you go from the date of the indictment to even just initial appearance, we're still May 10th of ... I'm sorry, June 29th was the date of ... June 7th was the date of indictment. His first appearance is June 15th of 2017, which is still 13 months from the time that he was indicted. And obviously, when one is indicted, that's the United States government telling this individual, we're here, we're coming to get you, and we are ready to proceed. And that particular case, you wait. It's not like Mr. Nix was going to walk over to the courthouse on his own and say that he could do that. Then we look at the reason for the delay. And in this particular case, the government articulated their reason was simply, we didn't want to interfere with Mr. Nix's state case. And I think that's a little, I would say, disingenuous, but they did. The government had several options at this particular case. The statute of limitations was not running at all. They could have waited to see what happened in the state case, and then indict Mr. Nixon. They didn't. They chose on June 7th of 2016 to indict him. They didn't do anything until May of the following year, which was the writ. But when they did bring him under a writ, he was then in primary federal custody. So to say that we wanted to wait, we wanted to delay bringing him here is not the case, because they did interfere. Because he was no longer sitting in the Denver Detention Center. He was now in custody of the United States Marshals, and specifically out at the GEO facility. And there was some question, because sometimes writs are not always honored from the state when one is in federal custody, to go back for the trial date. So there was really a question at that particular moment where we were actually going to see Mr. Nixon for his trial. So what should the government have done, the federal government, that you would then say they did not violate the Sixth Amendment? Well, Your Honor, I think what the government should have done was look at the case and the dates and statute of limitations. There's a five-year statute of limitations in this particular case. If they were worried about interfering with the state case or something along those lines, which I mean, they say that was their concern, but it wasn't, because they did interfere by bringing him back to the federal courts, or bringing him to the federal courts. They could have simply waited. They could have waited and then gone seek an indictment once the state case was over. So charging, that's one way they could have delayed their charge. Yes, Your Honor. A simple way. I mean, they're in control of that. Mr. Nixon doesn't get to say, you know, hey, let's not go just yet. They made the decision, and they're aware of that. They know there's a five-year statute of limitations. There was no rush. And so what the federal government did do doesn't prejudice your client any more than had it simply delayed charging? Well, Your Honor, actually, it complicates things when one is charged federally. One, if they are brought over to the district court for an arraignment, for initial appearance, it does complicate things because they're now going to be maintained in federal custody. Once the federal government has an individual, they don't like to give them back to the state. And frankly, it was rather unusual. In this particular case, the court asked whether, well, what did you do, Mr. Rice? You were representing Mr. Nixon on his state case. Did you contact the federal government? No. In my experience, if there's been a state case and the feds pick it up, they immediately swoop in and get the individual on that writ, and they don't give them back until the federal case is over, even to some point in state cases where speedy trial is ticking. Doesn't that support the federal government on the second Barker factor, the reason for delay that it did not want to do that? Well, Your Honor, like I said, if they didn't want to do that, then they didn't have to indict when they did. And also, had they brought him over immediately, we could have potentially resolved that case sooner. From June 7th, date of indictment, Mr. Nixon didn't go to trial until August of 2017. If he had gone over to the U.S. District Court, had been arraigned, he would have had his trial within 70 days. This was not a case of great complexity where any type of excessive ends of justice would have been required or a motion for complexity would have been asked for. It's a rather straightforward case. So even if that had been done, it could have been resolved. And normally, when we have companion state and federal cases, the goal is to try and get the federal case resolved as expeditiously as possible because of sentencing guidelines. You want that federal case resolved first. Because if there's a conviction in state court, you have other federal sentencing guideline points and enhancements, potential enhancements that could come into effect. So had he been brought over, we could have dealt with it. We could have, whether it was gone to trial or a plea, it could have been resolved expeditiously, Your Honor. Does it matter that the federal charge really is a simple one, about as simple as they come, the felon in possession, charged no, what is the prejudice? There was not evidence lost, there were not witnesses, no longer available, the elements are so straightforward. You're a felon, you had a gun, the gun traveled across state lines. And in this particular case, the motion to dismiss was held prior to the state court case going to trial. But, and the elements are very simple. Did someone have a previous conviction, were they a prohibited person, did they possess the firearm? In this particular case, the allegations were the officers were in the Park Hill area, they believe there's suspected activity, and individuals either walk away or flee, and they allege that something was thrown, and they believe that it was a handgun, and they believe that it was Mr. Nixon. At the time that the motions were filed, yeah, it's a very straightforward case. They say they have an officer who said they saw Mr. Nixon throw something and coincidentally found it. Could it have been there, that particular area? Possibly. But as this case developed, and in the state court case, there was no DNA. But it was basically, magically, when we got to some 11 months later, the federal government was able to test and swab the firearm for DNA evidence that, you know, wasn't available. It wasn't available. Did you argue that in your briefs? We did not, Your Honor. We did not. And so, obviously our position is it should have been, Mr. Nixon should have been brought over. The defendants, the court inquired in the lower court, you know, what did Mr. Nixon do? Well, he was waiting. He was told that the federal government was going to come get him. You know, when they say they're going to do it, as counsel, I say, my experience is they usually come get you. The fact that they haven't come get you, I don't know. But we don't know. So he, there's no question that he knew that there was this charge looming. No, Your Honor. When the case was dismissed in state court, it said that the motion dismissed, which is part of the record, said that we're dismissing our state case. The feds have picked it up. It's forthcoming. So it's not like Mr. Nixon never received a copy of the indictment and said, we'll come get you when we're ready. But he didn't know that there was a forthcoming federal charge. He'd been advised of that, that by the dismissal of the state court case, that charges were coming. Yes, Your Honor. How do you deal with, if you recall, the Supreme Court's opinion in Doggett, where the court, as I read it, said that if, in terms of a similar argument that you're making, that there was no counsel during the period of the delay, but that the Supreme Court, as I recall, said to the effect that, well, but if the defendant had been aware of the charge, that that would have weighed heavily in favor of the government. Well, Your Honor- How do you deal with that Doggett dicta? I believe that you have to look at the particular individual. PSI, I think, was in this particular case. Mr. Nixon is not a very sophisticated man. He has a ninth grade education. Is he going to say, hey, gee, I think I better exercise my speedy trial rights to a court that he's never been to, all that is federal government, he doesn't know, should I do something? He's not saying, hey, Mr. Reich, will you go take care of this matter for me? I'm indigent. Will you go take care of it? Anything along those lines. So the right to counsel, it's a fundamental right. And as soon as he made his first appearance, counsel was appointed and they started exercising his rights. And yes, to say, okay, I have a right. Most people don't appreciate or understand most of the rights that they have, let alone am I giving it up? If I'm doing something, am I sitting here waiting? What am I supposed to do? But as soon as he got counsel and had the federal government picked him up shortly after indictment, I'm not saying they had to come that same day or within the next day, but within a reasonable time, more than 15 months, then he would have been a given counsel. And he's the type of individual that the courts always looked out for to make sure that he has counsel. And once he had counsel, they exercised his rights. Thank you. Thank you, counsel. And just so you and Ms. Farley know, because I think I cheated you out of your rebuttal time, I'm going to give you an extra minute and a half for rebuttal. Thank you. Good morning, your honors. Mr. Reich, may it please the court, Paul Farley for the government. I think to start, we have four prongs under Barker to look at. I thought I'd start with the fourth prong to pick up on a couple of things that Judge Phillips was asking about regarding prejudice to the defense. In Frias, this court said that prejudice is the most important of the four factors. And in fact, in that case, this court found the first three all against the government, but still, since there was no prejudice, found that there was no speedy trial problem. This court in Margheim, which is a 2014 decision, pointed out that in most circumstances, failure to specify prejudice will eviscerate the claim. Now, the kinds of prejudice or the categories of prejudice which the courts have recognized are threefold, and in sort of order of importance, the minimization that the possibility that the delay will hinder the defense, eliminating oppressive pretrial incarceration, and then minimization of anxiety and concern. We don't have oppressive pretrial incarceration here. And in fact, this was conceded below when the district court was going through the factors. This is at volume two, pages 46 and 47. It said, what's the status? The defense said, well, he's on a no-bond hold on this murder charge in the state. And the court said, well, I guess we don't have oppressive pretrial. What about, and then moved on. There was never an objection. There was never a hold your horses, Your Honor. This is a serious thing. So we, on that point, to the extent that there's a claim for oppressive pretrial incarceration, we think that's, you know, it's been waived or it's at least plain error, and plain error has not been argued. Secondly, there was discussion in the briefs, though I didn't hear it at argument today, about good time. I'm happy to talk about good time, but the key things on this is that it's pretrial incarceration, which is the concern here, not post-conviction incarceration. And so there's not a good time component to oppressive pretrial incarceration. Is this par for the course? Is this just how things work with the U.S. Attorney's Office in Colorado or elsewhere, or did this one slip through the cracks? In what respect? You're talking about the gap between the charge and the arraignment? Yes. I think that's a little unusual, Your Honor, but I want to be clear on this point. You know, the defendant was standing trial on murder one, attempted murder one, assault with a deadly weapon. You know, there was a series of serious state charges that were pending and actually preceded the federal charge, and it's not uncommon in the spirit of comedy to let those things play out on the state side. And so, you know, could the federal government have arraigned him sooner? Could have, yes. I think that at most this would be a case of benign neglect, and I'm not even sure I would put that brush on it. Would you do it all the same way again? With the benefit of 20-20 hindsight, probably not. But, again, we have the benefit of 20-20 hindsight. So what would you do? I might have monitored the state proceedings a little more closely in seeing if there was an obvious earlier place where he could have been arraigned. But let's come back around to what went on in the state case. Early in February of 2017, so that's about eight months into the process, the defendant waved speedy in the state murder trial. That's at volume one, page 79. So it was clear the state murder trial was proceeding. How quickly that was proceeding, given what was going on, is very much a judgment call. You know, if I'm a state prosecutor, do I think I'm going to get this to trial in six months? Is it going to take me a year? You sort of don't know until you're into it. So this 20-20 hindsight thing, I think, is not really the correct measure. In terms of the prejudice to the defense itself, the defendant needs to make a particularized showing of prejudice. And the test that this court has specified as recently as free us is that the delay had to result in the loss of specific evidence or the unavailability of certain witnesses. Now, we don't have that here. We don't have a claim of that here. Really, you know, the only what we have is if I've been brought over to federal custody sooner, I could have invoked my Federal Speedy Trial Act right sooner. I'm not sure that advances the ball very much because time in state custody awaiting trial is excludable under the Federal Speedy Trial Act. So if he comes over, he's arraigned, invokes his rights, he's still in primary state custody. The fact that he's been writ over for purposes of arraignment doesn't change the fact that the state has primary custody and has a right under the Weeks decision and other decisions of this court to exhaust the remedy against him. So he comes over, he gets arraigned, he invokes speedy. We begin excluding the time because he's still awaiting state trial in state court, and that plays out. So there's no disadvantage to the defense whatsoever in that fact. Seltzer on this one, I think, illustrates this point. In Seltzer, the prejudice was sort of twofold. One, in that case, the government appeared ex parte before the magistrate judge while the defendant was still in state custody. And secondly, and perhaps more importantly, his accomplice was brought in and turned on him and cut a deal. And that led him, Seltzer, the defendant, kind of hanging loose at that point. In fact, the district court, and this is a footnote in Seltzer, the district court observed, gee, I wonder how this might have played out differently if Mr. Seltzer had been brought in first rather than his co-defendant. And so there was palpable prejudice in that regard. Mr. Forley, can I ask you a couple of questions about that? The first is there's some discussion in the briefs about whether or not it is a valid or permissible argument for impairment of the defense, the inability to invoke a Speedy Trial Act claim. Under Seltzer, even though it was not the only source of prejudice that Judge Henry found, it was one. So is it a permissible source of prejudice for impairment of the defense on a Sixth Amendment claim, the inability to invoke a Speedy Trial Act claim? I understand your argument at Benedictine. Well, I think Seltzer recognizes the Speedy Trial Act as a valid concern when you're looking at prejudice. But I note that even in Seltzer, the defendant there, even pro se, twice asked the court for Speedy Trial on his own and asked for counsel once on his own. So we don't presume that defendants don't know that they're sitting in a jail cell and nothing's happening. So there's certainly that ability to assert that right even if you're uncounseled. Again, as I pointed out, in this case, this defendant with counsel waived Speedy in the state murder trial. So it was well aware of what Speedy was about, had counsel advising him on the point of Speedy. He may have or not had the slightest clue about what the federal Speedy Trial Act entails, right? The federal Speedy Trial Act, that's true. He may not, but constitutional Speedy, which is what we're talking about. Well, I thought we were talking about both. I was asking you about the source that Judge Henry found on prejudice on a Sixth Amendment claim, the inability to assert an SDA claim, a Speedy Trial Act claim. And I think you were saying, and tell me if I'm wrong, that that is at least a permissible source to look at. It doesn't apply here. It is a permissible source to look at, but what sort of tipped the scales in Seltzer was the fact that there had been the ex parte contact with the government attorney, with the magistrate judge, and the . . . You don't know what would have happened if he had been charged rather than the co-defendant, right? I'm sorry? And you're saying that you don't know what would have happened if Seltzer had been charged first rather than the co-defendant. Yeah. One of the things that I think markedly separates Seltzer from this case and from Frias is the fact that the defendant there was being held in state custody after the state had exhausted its remedy for him. He was originally found in state custody. The government didn't charge him at that point, kind of let it go for a bit because he was serving a state sentence, and then they lodged a federal detainer. And so after his state sentence had exhausted, he tried to secure his release, and the custodian said, no, there's a detainer, so I'm just going to hold you here. So . . . Okay. I'm sorry. I looked like you had another question. Well, I did, but I wanted to let you finish. Okay. You finished? I'm good. Thank you. Okay. So the other . . . I told you I had a couple of questions. So one of the questions is on what you had made, this earlier argument that, well, even if he had been . . . Nixon had been charged earlier and that it still would have been . . . it didn't matter. He didn't lose an SDA claim because it still would have been excludable with regard to the 70 days. That's correct. But when you said in Seltzer, you know, the panel said, well, we don't know what would have happened if Seltzer would have been charged first. Well, isn't that kind of what happened here? Because, you know, we don't know what the response would have been to an SDA claim. Maybe your predecessor in your office would have said, well, the 70 days, you know, is extended. It's excludable time because he's already still in state custody or whatever. And Mr. Nixon's lawyer would have maybe argued X. We don't know what X would have been. We don't know what the district judge would have said. So it's a lot of what ifs. I agree, Your Honor. I don't want to put words in your mouth, Judge Phillips, but I thought you said something like this earlier in the argument with my opponent. This underscores why it made sense for the government to wait because the kind of questions you're asking while there's the murder prosecution well down the road, now we're trying to juggle, okay, which one's going to go first and how we're going to approach it. Now, if we assume that the defendant would have pled out right away, again, with 20-20 hindsight, maybe it wouldn't have been an issue. But I don't think that's what Barker v. Wingo asked us to do, to kind of look in the crystal ball and say what if, coulda, woulda, shoulda, you know, in a perfect universe. And that's why, coming all the way back around, why even in Frias, even after the government failed the first three prongs, we looked at what was the prejudice, what was the injury to this defendant. As we noted in our 28-J, he got credit for all of his state time, including time before the federal charge was even filed. So he only spent six weeks in federal custody. And he can't really point to, I mean, would he have not pled guilty? Would he have gone to trial on the federal gun charge? That's not been asserted here. So I think even through some of these other things, if we want to armchair quarterback it, in the end, there's no harm to this defendant. And I think that's what speedy trial is intended to do, is make sure that a defendant gets promptly, as promptly as we can manage, from the point of charge to a resolution of the charges with no hindrance to the defense. And I think that occurred here. A couple other points, just tangentially on this. We had a discussion in the briefs about the activity of the state docket. The defense pointed out that, well, gee, there were only seven hearings. If you look at volume one of the record, pages 71 to 84, which has the state docket, there were 104 other actions in this case, 36 of which were initiated by the defense. So it was a pretty active docket over the course of about a year and some change. I think that's it. I only have a minute left. If there are no further questions, I would go. Please. Mr. Verli, I had a question. What do you deal with your adversary's argument that, well, it's all well and good on the second Barker factor about the government's reason, that you say, well, the murder prosecution is complex. There was a lot going on. And he says, yeah, but on May 17th, three and a half months before it was supposed to go to trial, they issued a writ at whatever it's called, at prosecuendum. Prosecundum, yeah. So they say, well, apparently it wasn't that big a deal for the government because in the three and a half months prior to the trial in state court, they decided to bring him over at that time, so that really undercuts the government's supposed reason for waiting. What do you deal with that argument? Well, we're all mindful that there's kind of a one-year touchstone in here. And obviously, you know, Barker tells us that essentially if it's less than a year, there's nothing to talk about. And we probably aren't here having this discussion. Yeah, and I'm not talking about the first factor. I'm talking about the second factor, the government's reason for the delay. Oh, well, again, I think we were trying not to interfere with the state case. But I think at that point, after it went a year, and you're looking at that being something of a touchstone under the test, you bring them over. You know, could we have done it sooner? But I think I made this point in my brief. If the government had done this at 11 months, 12 months, 13 months, 14 months, we're satisfying really what speedy trial is about. You know, that year is operating to force that action. Like I said, was it done perfectly, this case? I can't say that it was. But I think like many, many cases in the rough and tumble with two different sovereigns and multiple charges, you try to work through it as best you can. And bottom line, this defendant wasn't prejudiced. He can't show any prejudice, and we would ask the court to affirm. Thank you. Our position is that Mr. Nixon was prejudiced because once he's indicted, you know, the general rule of speedy trial attaches when the defendant is either arrested or indicted, whichever occurs first. And he was indicted, and he should have been brought before a court and had an initial appearance, and he would have been given counsel. And counsel at that point can make tactical decisions. Do we want to wait? Do we want to go forward? The government is like a steamroller. It's a little slow to get going sometimes. But if it gets rolling, you may not want to be standing in front of it. But they only have 70 days. Maybe they're not ready. We don't know because he wasn't brought over and given counsel. And to say that there is no prejudice, when you have a right, a fundamental right that would be given to you had you been brought to court and you were denied that, you denied counsel, that is prejudice. Well, but what about his argument, and you may have prejudice, but what about the argument that, well, you didn't have prejudice for this one reason, the seltzer point, that he could have invoked a Speedy Trial Act claim because it would have been excludable anyway. Well, Aaron, Mr. Seltzer's situation was he was trying to go to his mother's funeral or get out for medical reasons and post a bond. He had a bonds person initially try to do that. It wasn't as though Mr. Seltzer was demanding to get me to trial. Mr. Seltzer wanted to get out so he could go see his mom before she passed away. It was really to have a bond set. I don't think he understood that in federal court you can't go post a surety bond, hence the reason why he had his state court surety trying to file motions, and it was stricken because he was obviously not a licensed attorney. And in this particular case, this is also distinguishable from Frias because in that particular case their state counsel had coordinated with the U.S. attorneys as it related to charges. So I think I'm out of time. Thank you very much. Appreciate the excellent advocacy of both counsel and your briefs in argument today. This matter will be submitted. Court is in recess subject to recall.